**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Diana Harrod, | : | Case No. 1:14CV805 |
| Plaintiff, | : | |
| vs. | : | |
| | : | **MEMORANDUM AND** |
| Carolyn W. Colvin | : | **ORDER** |
| Acting Commissioner of Social Security | | |
| | : | |
| Defendant. | | |
| | : | |

Plaintiff seeks judicial review of a final decision of the Commissioner denying her application for Supplemental Security Income (SSI) and Disability Insurance Benefits under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423, 1381, *et seq*., and § 405(g).  The parties have consented to the Magistrate entering final judgment in this case pursuant to 28 U.S.C. § 636(c)(1) and FED. R. CIV. P. 73 (Docket No. 15).  Pending are briefs on the merits filed by both parties (Docket Nos.17 & 20).  For the reasons set forth below, the Magistrate affirms the decision of the Commissioner.

## I.  PROCEDURAL BACKGROUND

On October 27, 2011, Plaintiff filed both her applications for SSI and DIB, alleging disability beginning September 1, 2008 (Docket No. 13, pp. 313-319; 320-325 of 635).  Plaintiff's claims for both SSI and DIB were denied on March 3, 2012, and upon reconsideration on May 9, 2012 (Docket No. 13, pp. 234-240; 241-249; 251-

257; 258-264 of 635). Plaintiff filed a written request for a hearing on May 15, 2012 (Docket No. 13, p. 265 of 635). On January 14, 2013, Administrative Law Judge (ALJ) John M. Dowling presided by video from St. Louis, Missouri, over the hearing in Mansfield, Ohio at which Plaintiff, represented by Katherine M. Braun, was present. Vocational Expert (VE) Cyndee Burnett participated by telephone (Docket No. 13, pp. 86-88 of 635). The ALJ issued an unfavorable decision on January 18, 2013 (Docket No. 13, pp. 70-80 of 635). The Appeals Council denied review of the ALJ's decision on February 26, 2014, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 13, p. 5 of 635).

## II. FACTUAL BACKGROUND

A.    ADMINISTRATIVE HEARING

1.    PLAINTIFF'S TESTIMONY

Plaintiff testified that she is 50 years old and lives alone in a ground floor apartment with her cat (Docket No. 13, p. 90 of 635). She is approximately five feet tall and weighs 210 pounds (Docket No. 102 of 635). Plaintiff has never held a driver's license because she is unable to read the test preparation manual. For transportation, she relies on her friends or walks (Docket No. 13, pp. 90-91 of 636). Plaintiff stated that she dropped out of school in the ninth grade, was in special education classes throughout her schooling, and that reading is difficult for her (Docket No. 13, p. 91 of 635). In response to the ALJ's questions, Plaintiff explained that she can read some parts of the newspaper, a menu, and traffic sign, but is unable to do basic math and does not have her GED (Docket No. 13, p. 92 of 635).

Despite her learning difficulties, Plaintiff received a certificate as a State Tested Nurse Assistant (STNA) in 1989 (Docket No. 13, pp. 92-93 of 635). Since 2007, Plaintiff has worked as a nurse's aide for Almost Family, Inc. (Docket No. 13, p. 93 of 635). Plaintiff testified that she is unable to work as a nurse's aide in nursing homes because she is unable to lift (Docket No. 13, p. 93 of 635). Instead, she provided care within a patient's

2

home.  Plaintiff described giving clients baths, cleaning their homes and preparing meals among her job tasks, emphasizing that she is unable to lift clients (Docket No. 13, pp. 94-95 of 635).  Plaintiff explained that she works approximately 15 hours one week and 21 hours the next, but is unable to work additional hours because her hips bother her (Docket No. 13, p. 95 of 635).  Plaintiff indicated that she has to sit quite often, which her clients permit (Docket No. 13, p. 95 of 635).  Plaintiff opined that she sits every twenty minutes to an hour because she experiences numbness and tingling in her hips, which forces her to sit, or if she is walking, to grab something for stability or support (Docket No. 13, p. 96 of 635).  Plaintiff added that she treats with Dr. Toward and that he gives her medication for her hips.  He also advised that she has arthritis in her hips, fibromyalgia, and chronic pain (Docket No. 13, p. 96 of 635).

Plaintiff detailed her past work history including nursing aide jobs at Mansfield Memorial Homes, First Choice Medical Staffing, Michael Coleman, Inc., and a dietary job at Mansfield Memorial Hospital approximately 15 years earlier (Docket No. 13, pp. 96-98 of 635).  According to Plaintiff, she has not lifted more than 20 pounds at any job during the preceding 15 years (Docket No. 13, p. 98 of 635).  Plaintiff also testified that  she always got help when performing jobs that required lifting (Docket No. 13, pp. 97-98 of 635).

During direct examination by her attorney, Plaintiff testified that her hips, muscle spasms, and her hip and leg  numbness and tingling have gotten worse since her prior hearing (Docket No. 13, p. 99 of 365).  Plaintiff stated that the pain in her back is about as bad as in her hips, but that the worst pain is in her hips (Docket No. 13, p. 99 of 365).  Plaintiff explained that the tingling and numbness she experiences makes her leery to go into stores and gives her anxiety (Docket No. 13, p. 99 of 365).  She also noted that the sensations in her hip require her to stop walking after five minutes, and that she has to stand and hold something for about five minutes (Docket No. 13, pp. 99-100 of 635).  Plaintiff also gets muscle spasms in her back and hips which occur quite frequently (Docket No. 13, p. 100 of 635).  According to Plaintiff, she is typically lifting, bending, or walking

3

when the spasms occur (Docket No. 13, p. 100 of 635).  Plaintiff testified that she can lift about five pounds now, but her legs and hips bother her quite a bit (Docket No. 13, p. 100 of 635).

Plaintiff takes Neurontin and a muscle relaxer for her symptoms, but noted side effects including drowsiness (Docket No. 13, p. 101 of 635).  Due to the side effects, Plaintiff does not take these medications when she goes to work, instead taking Tylenol or other over-the-counter medications to alleviate her pain so that she does not become drowsy (Docket No. 13, p. 101 of 635).  Plaintiff testified that she works no more than six hours in any given day and three hours the other days (Docket No. 13, p. 101 of 635).  After a three hour day, Plaintiff indicated that she hurts and needs to lie down  when she gets home (Docket No. 13, pp. 101-102 of 635).  Plaintiff estimated that she lies down for maybe an hour or an hour and a half (Docket No. 13, p. 102 of 635).  When asked about problems with her legs, Plaintiff reported feeling numbness and cramps in her feet, but noted that she experiences these symptoms in her right leg more than her left (Docket No. 13, p. 102 of 635).  Plaintiff testified that she experiences numbness in her feet quite often, as many as three, four, or five times a week and that it lasts for about 20 minutes causing her to sit down (Docket No. 13, p. 102 of 635).  Plaintiff also has diabetes, but indicated that it was under control (Docket No. 13, p. 102 of 635).  Plaintiff explained that in recent years her weight had been gradually increasing, which has caused her pain in her hips and legs.  In terms of sitting, Plaintiff explained that sometimes she is unable to sit, lie on her back or stand and has to lie on her side for about an hour and a half to relax her muscles (Docket No. 13, pp. 103-104 of 635).

Plaintiff also testified about her anxiety, explaining that it gets worse when she goes to the store, causes "pattering" in her heart, and makes it difficult to breathe (Docket No. 13, p. 104 of 635).  According to Plaintiff, her anxiety is triggered when a lot of people are around her talking or she hears kids causing her to hurry up and leave the store (Docket No. 14, p. 104 of 635).  Plaintiff  noted that she suffers from depression when she thinks about her mother and her recent house fire. She also worries about whether she is performing her job adequately

(Docket No. 14, p. 104 of 635). Plaintiff described crying spells which occur two and three times a day for between 20 to 30 minutes (Docket No. 14, pp. 104-105 of 635). Plaintiff also testified that sometimes she cries at work and in front of clients and that she worries that she would be fired if her employer found out (Docket No. 13, p. 105 of 635). In response to her attorney's question, Plaintiff testified that she misses work two to three times a month because of muscle spasms and her fear of walking (Docket No. 13, pp. 105-106 of 635).

Plaintiff opined that she could be on her feet for no more than four hours during an eight-hour workday, but on the following days would only be able to be on her feet for an hour and a half before needing to sit down awhile (Docket No. 13, p. 106 of 635). Plaintiff indicated that she would like to work more, but cannot because of her condition, noting that her depression, hips, muscle spasms, and other symptoms make her days uncertain (Docket No. 13, p. 107 of 635). Although Plaintiff testified that she is able to perform household chores such as sweeping and mopping, she noted that running the sweeper bothers her hips quite a bit (Docket No. 13, p. 107 of 635). Plaintiff also explained that she is able to do chores about a half-hour before getting side tracked (Docket No. 13, p. 107 of 635).

Plaintiff spends her days playing with her cat, preparing meals, cleaning dishes, taking a bath and getting ready for bed (Docket No. 13, p. 108 of 635). She normally sleeps between eight and ten hours, depending upon how she feels (Docket No. 13, p. 108 of 635). Plaintiff explained that on some days she does not feel like getting out of bed, but that she does so on a daily basis (Docket No. 13, p. 109 of 635). The ALJ followed up counsel's questions by confirming that Plaintiff had not had any more x-rays taken of her hips since her prior hearing, that her primary care physician was Dr. Toward and that she smokes approximately 10 cigarettes a day (Docket No. 13, p. 109 of 635). Plaintiff also testified that she treats at "the center" in Mansfield for her mental health, had treated with Mary Rufer, but was not currently seeing anyone to treat her anxiety other than the medication management by Dr. Toward (Docket No. 13, pp. 109-110 of 635). Plaintiff testified that she is compliant with

her medications while at home, but does not take them before work due to the side effects (Docket No. 13, pp. 110-111 of 635).  In response to the ALJ's questions, Plaintiff elaborated concerning her depression, noting that her mother passed away in April and that she lost everything in an apartment fire in March  13, pp. 110-111 of 635).  When asked about her Norvasc and Symbicort medications, Plaintiff indicated she stopped  taking them because they made her breathe heavier and made her skin break out with rashes (Docket No. 13, p. 112 of 635).

## 2.    VE TESTIMONY

The VE described Plaintiff's past work as a personal care aide, DOT[1] 354.377-014, with a specific vocational preparation (SVP)[2] of 3, listed as medium, but performed by Plaintiff as light exertion, certified nursing assistant (CNA), DOT 355.674-014, SVP of 4, listed as medium, but performed as light exertion (Docket No. 13, p. 114 of 662).  The ALJ then presented his first hypothetical question:

> Assume a person of Claimant's age, education, and work experience who is able to perform the exertional demands of light work.  However, the person would have the following non-exertional limitations.  The person is capable of doing a job that allows for alternating between sitting and standing positions at will, provided that the person remain productive.  And the person would be limited to simple, routine tasks.  Can an individual with those limitations perform the Claimant's past work as it was actually performed or as it is customarily performed per the DOT?

(Docket No. 13, pp. 114-115 of 635).  After considering the hypothetical, the VE responded that such an individual would not be able to perform Plaintiff's past work (Docket No. 13, p. 115 of 635).  The ALJ asked whether there would be any other jobs in the regional or national economy that would accommodate such limitations (Docket No. 13, p. 115 of 635).  The VE replied that there would be jobs such as: office helper, DOT

---

[1]  Dictionary of Occupational Titles ("DOT")

[2]  SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

239.567-010, with a SVP of 2, light, having 90,000 jobs in the national economy, and 800 in the State of Ohio; ticket seller, DOT 211.467-030, with a SVP of 2, light exertion, having 80,000 jobs in the national economy and 600 in the State of Ohio; cashier, DOT 211.462-010, with a SVP of 2, light, with 4,000 jobs in the national economy and 6,000 in the State of Ohio (Docket No. 13, p. 115 of 635).

The ALJ then inquired about the typical number of permissible monthly absences  in an unskilled work environment (Docket No. 13, p. 115 of 635).  The VE responded that the average number of unexcused  absences would be about one per month.  The ALJ also confirmed with the VE that in unskilled work, an individual normally has two 15-minute breaks and a half hour lunch or just a one-hour lunch break (Docket No. 13, p. 115 of 635).  The ALJ further questioned the VE about work breaks, asking:

> If somebody has to take additional breaks above and beyond those standard breaks, or has to miss more than a day, one day per month on a continual basis due to dealing with symptoms of impairments, is that going to rule out competitive employment?

(Docket No. 13, p. 115 of 635).  The VE indicated that additional breaks or absences would preclude the individual from competitive employment (Docket No. 13, p. 115 of 635).  The ALJ's next asked:

> If somebody is dealing with impairments during the day, there may be – or even in the sitting/standing situation where they are not always productive, they're actually off-task for a percentage of the day, what's the limit as far as – how much can somebody be off-task on a continual basis in a workday before that person is no longer going to be employable?

(Docket No. 13, p. 116 of 635).  In response to the ALJ's question, the VE replied that the average off-task allowance is about 10% of a workday (Docket No. 13, p. 116 of 635).   The ALJ then confirmed with the VE that if the individual is off-task more than 10% on a continual basis then they're not going to be competitive in a work environment (Docket No. 13, p. 116 of 635).

During cross-examination by Plaintiff's counsel, the VE was asked to revisit the ALJ's first hypothetical question. Counsel asked whether a person who is unable to be on his/her  feet more than an hour and a half and must sit the rest of an eight-hour day would be consistent with a light or sedentary occupational base (Docket

No. 13, p. 116 of 635).  The VE responded that the scenario presented by Counsel would be more closely aligned with sedentary work (Docket No. 13, p. 117 of 635).

**B.    MEDICAL RECORDS**

Summaries of Plaintiff's medical records, to the extent they are necessary and relevant to the issues before this Court, follow.

### 1.    MEDCENTRAL HEALTH SYSTEMS

- On April 14, 2009, Plaintiff underwent a MRI of her lumbar spine for low back pain extending into both of her hips. Interpreting Radiologist, Paul Buehrer, M.D. found multiple levels of degenerative disc changes with apophyseal joint anthropathy and mild spinal stenosis at L4-5 (Docket No. 13, pp. 461-462 of 635).

- On May 21, 2011, Plaintiff arrived at Mansfield Hospital complaining of pain, swelling and drainage of moderate severity.  On examination Plaintiff had erythema and an ulceration which was warm and dry.  Plaintiff's diagnosis indicated that she had an abscess, cellulitis (skin infection), and MRSA/VRE (Docket No. 13, pp. 437-441 of 635).

### 2.    THIRD STREET FAMILY HEALTH SERVICES - DR. BRETT TOWARD, M.D.

- On July 14, 2009, Plaintiff complained of chronic pain in her lower back.  MRI and x-ray results of Plaintiff's lower back found multi-level degenerative disc disease.  Dr. Toward diagnosed lumbago, lumbar disc degeneration, and chronic pain syndrome.  Plaintiff was referred for a consultation with a specialist and prescribed Neurontin,[3] and diclofenac sodium[4] (Docket No. 13, pp. 505-507 of 635).

- On October 27, 2009, Plaintiff reported that she had been off depression medications because she did not think they were helping; however, she had been experiencing increased anxiety and paranoia.  Plaintiff expressed fear and paranoia.  Dr. Toward's assessment of Plaintiff notes benign essential hypertension, depression, and generalized anxiety disorder.  Dr. Toward

---

[3] Neurontin is prescribed to relieve nerve pain and is sometimes prescribed to help control seizures. *Neurontin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 2:37 PM), http://www.webmd.com/drugs/2/drug-9845-8217/neurontin-oral/gabapentin-oral/details.

[4] Diclofenac sodium is prescribed to relieve pain, swelling, and joint stiffness caused by arthritis. *diclofenac oral:Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 2:39 PM), http://www.webmd.com/drugs/2/drug-4284-4049/diclofenac-oral/diclofenacsodiumenteric-coatedtablet-oral/details.

prescribed paroxetine,[5] Vistaril pamoate,[6] hydrochlorothiazide-lisinopril,[7] and Celexa[8] (Docket No. 13, pp. 504-505 of 635).

- On November 3, 2009, Plaintiff indicated that she was feeling better since her last treatment, noting that her night time anxiety had decreased, her sleep was good, her appetite stable, and that her nausea had improved.  Dr. Toward's medical assessment reflects diagnoses of primary insomnia, generalized anxiety disorder, and that Plaintiff's medications were continued (Docket No. 13, pp. 502-503 of 635).

- On March 11, 2010, Plaintiff reported that she could not take Vistaril or Paxil because of undesirable side effects.  Plaintiff also complained of chronic pain and indicated that she had stopped taking Neurontin after a few days.  Dr. Toward's assessment notes accelerated essential hypertension, myalgia and myositis, depression and chronic pain syndrome.  Dr. Toward recommended a renal function panel, serum TSH level and prescribed Paroxetine, diclofenac sodium, Vistaril Pamocate, Remeron,[9] hydrochlorothiazide-lisinopril, Neurontin, and cetirizine[10] (Docket No. 13, pp. 501-502 of 635).

- On April 8, 2010, Plaintiff indicated that her Remeron medication had worked well.  The treatment record reflects that Plaintiff had not been to the doctor for over six months.  Plaintiff was described as being in poor compliance and having gained weight due to a poor diet.  On examination, Dr. Toward noted no abnormalities and continued Plaintiff on her medications (Docket No. 13, pp. 500-501 of 635).

---

[5] Paroxetine is prescribed to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and post-traumatic stress disorder by restoring serotonin in the brain. *paroxetine oral:Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 2:42 PM), http://www.webmd.com/drugs/2/drug-6969-9095/paroxetine-oral/paroxetine-oral/details.

[6] Vistaril or hydroxyzine pamote is an antihistamine and is prescribed to treat allergic reactions. *hydroxyzine pamoate oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 2:42 PM), http://www.webmd.com/drugs/2/drug-7092/hydroxyzine-pamoate-oral/details.

[7] Hydrochlorothiazide-lisinopril is prescribed to treat high blood pressure. *Lisinopril and Hydrochlorothiazide: MedlinePlus Drug Information*, MEDLINEPLUS, (Oct. 14, 2014, 2:48 PM), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601070.html.

[8] Celexa is prescribed to treat depression. *Celexa oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 2:50 PM), http://www.webmd.com/drugs/2/drug-8603/celexa- oral/details.

[9] Remeron is prescribed to treat depression. *Remeron oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 2:57 PM), http://www.webmd.com/drugs/2/drug-13707/remeron-oral/details.

[10] Cetirizine is an antihistamine prescribed to treat allergy symptoms. *Cetirizine: MedlinePlus Drug Information*, MEDLINEPLUS, (Oct. 14, 2014, 3:07 PM), http://www nlm nih.gov/medlineplus/druginfo/meds/a698026.html.

- On June 8, 2010, Plaintiff complained that her pain was unchanged and that she was walking for 30 minutes each day.  In his assessment, Dr. Toward diagnosed Plaintiff as having benign essential hypertension, COPD, and type 2 diabetes mellitus, uncomplicated and controlled.  Plaintiff was continued on her medications which included Spiriva,[11] Advair Diskus,[12] Neurontin, Soma,[13] hydrocholorothiazide-lisinopril, cetirizine, Remeron, and metformin[14] (Docket No. 13, pp. 499-500 of 635).

- On July 29, 2010, Plaintiff complained that she was having an allergic reaction to her diabetic medications, specifically metformin.  Dr. Toward 's diagnoses of June 8, 2010 were affirmed with the addition of chronic pain.  Plaintiff was prescribed Januvia,[15] Soma and metformin was continued (Docket No. 13, pp. 497-498 of 635).

- On September 28, 2010, Plaintiff reported feeling numbness in both of her feet.  The treatment notes reflect  that Plaintiff had been non-compliant with her metformin treatment in the past and had not started her Januvia until about three or four weeks ago.  Dr. Toward's assessment noted accelerated essential hypertension, COPD, chronic pain, and depression.  Dr. Toward continued Plaintiff on her medications, but added Chantix[16] (Docket No. 13, pp. 496-497 of 635).

- On December 28, 2010, Plaintiff's blood pressure and cholesterol were noted as being higher in her recent lab tests.  Dr. Toward's assessment reflects diagnoses of accelerated essential hypertension, type 2 diabetes mellitus, uncomplicated and uncontrolled, and myalgia and mysotis.  Plaintiff was continued on her medications (Docket No. 13, pp. 494-496 of 635).

- On January 27, 2011, Plaintiff was seen by Trish A. Trubachik, nurse practitioner certified (NP-

---

[11] Spiriva is prescribed to treat and control symptoms associated with COPD. *Spiriva with HandiHaler inhalation*: *Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:09 PM), http://www.webmd.com/drugs/2/drug-89062/spiriva-with-handihaler-inhl/details.

[12] Advair Diskus is prescribed to prevent symptoms associated with ongoing COPD. *Advair Diskus inhalation: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:11 PM), http://www.webmd.com/drugs/2/drug-20538/advair-diskus-inhalation/details.

[13] Soma is prescribed to treat short-term muscle pain and discomfort. Soma oral: *Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:12 PM), http://www.webmd.com/drugs/2/drug-12153/soma-oral/details.

[14] Metformin is prescribed for patients with type 2 diabetes and is used to control high blood sugar. *metformin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:14 PM), http://www.webmd.com/drugs/2/drug-11285-7061/metformin-oral/metformin-oral/details.

[15] Januvia is prescribed to control high blood sugar to prevent kidney damage in patients with type 2 diabetes. *Januvia oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:16 PM), http://www.webmd.com/drugs/2/drug-145704/januvia-oral/details.

[16] Chantix is prescribed to help support the cessation of smoking. *Chantix oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:18 PM), http://www.webmd.com/drugs/2/drug-144470/chantix-oral/details.

C) for her annual pap, pelvic, and clinical breast examination.  Plaintiff reported recurring abdominal pain, anxiety, and depression.  On examination, no relevant abnormalities were documented (Docket No. 13, pp. 489-493 of 635).

- On March 31, 2011, Plaintiff reported feeling stressed over a family situation.  Dr. Toward's assessment notes Plaintiff's diagnoses as accelerated essential hypertension, COPD, depression, and chronic pain syndrome.  Dr. Toward recommended a comprehensive metabolic panel, a lipid profile, glycosylated hemoglobin, ALH, and continued Plaintiff's medications, which included the addition of Soma and Ventolin HFA[17](Docket No. 13, pp. 488-489 of 635).

- On May 19, 2011, Plaintiff was seen by Leslie D. Thomas, Certified Nurse Practitioner (CNP) for a boil on Plaintiff's right breast and a fever.  Plaintiff reported nausea, vomiting, and a fever over the past two days.  Upon examination, Plaintiff was referred to the emergency room (Docket No. 13, pp. 486-487 of 635).

- On August 18, 2011, Plaintiff presented and the treatment notes reflect that she had been a no-show for regular appointments two months ago and had stopped taking some of her medications, which had resulted in anxiety.  Dr. Toward's assessment notes Plaintiff's diagnoses as accelerated essential hypertension, chronic obstructive pulmonary disease, depression, and chronic pain syndrome.  Dr. Toward prescribed Remeron, and hydrochlorothiazide-lisinopril (Docket No. 13, pp. 485-486 of 635).

- On September 26, 2011, Plaintiff saw Dr. Toward, who described Plaintiff's mood as euthymic and indicated that Plaintiff had been administered a psychometric depression scale, which was 11. Dr. Toward's assessment for Plaintiff lists accelerated essential hypertension, COPD, chronic pain, and dysthymic disorder.  Plaintiff was given glucose testing strips, prescribed Neurontin, Simvastatin,[18] Januvia, hydrochlorothiazide-lisinopril, Remeron, and Novasc[19] (Docket No. 13, pp. 484-485 of 635).

- On October 20, 2011, Plaintiff requested pain medication and reported that she had been experiencing a cold for two weeks.  On examination, Dr. Toward found Plaintiff's blood pressure was slightly better.  Plaintiff's medications were continued and she was prescribed Albuterol (Docket No. 13, pp. 481-482 of 635).

---

[17] Ventolin HFA or Albuterol is prescribed to prevent wheezing and shortness of breath caused by breathing problems including COPD. *Ventolin HFA inhalation: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing,* WEBMD, (Oct. 14, 2014, 3:19 PM), http://www.webmd.com/drugs/2/drug-22577/ventolin-hfa-inhalation/details.

[18] Simvastatin is prescribed in conjunction with a proper diet to help lower bad cholesterol and fats. *simvastatin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing,* WEBMD, (Oct. 14, 2014, 3:22 PM), http://www.webmd.com/drugs/2/drug-6105/simvastatin-oral/details.

[19] Norvasc is prescribed to treat high blood pressure. *Norvasc oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:24 PM), http://www.webmd.com/drugs/2/drug-5942/norvasc-oral/details.

- On December 22, 2011, Plaintiff reported going to The Center for her mood, that she had stopped her Norvasc and Symbicort medications because she did not like them, and had not stopped smoking. Dr. Toward prescribed albuterol, hydrochlorothiazide-lisinopril, simvastatin, Advair Diskus, Spiriva, Soma, and Flexeril (Docket No. 13, pp. 553-554 of 635).

- On June 19, 2012, Plaintiff indicated that she was still going to The Center for her mood, was still smoking, had suffered a house fire, and that her mother had passed away. Plaintiff was administered a psychometric depression scale which was 17. Dr. Toward recommended that Plaintiff lose weight and her assessment listed diagnoses including accelerated essential hypertension, COPD, and Depression. Plaintiff's treatment plan recommended a weight loss diet, intervention, and counseling on cessation of tobacco use. Plaintiff was prescribed Celexa, loratadine, simvastatin, hydrochlorothiazide-lisinopril, and she was discontinued on Flexeril[20] (Docket No. 13, pp. 619-621 of 635).

- On September 18, 2012, Plaintiff inquired about other medications for anxiety. It was noted that Plaintiff was still smoking, reported experiencing anxiety, but had not followed the plan to see a social worker and go to The Center. Dr. Toward's assessment reflects diagnoses of accelerated essential hypertension, COPD, and Depression. Plaintiff's therapy included weight loss diet, intervention, and counseling on cessation of tobacco use. Plaintiff was prescribed loratadine,[21] buspirone,[22] simvastatin, hydrochlorothiazide-lisinopril, Celexa, promethazine-DM,[23] and Remeron (Docket No. 13, pp. 616-618 of 635).

### a. BEHAVIORAL HEALTH ASSESSMENT

On September 22, 2011, Plaintiff underwent a behavioral health assessment with Mary Rufer, LISW-S (Licensed Independent Social Worker with Supervised designation) for depression and anxiety. According to the report, the appointment with Plaintiff lasted 50 minutes. Ms. Rufer noted that Plaintiff needs symptom and

---

[20] Flexeril is prescribed to treat muscle spasms. *Flexeril oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:27 PM), http://www.webmd.com/drugs/2/drug-11372/flexeril-oral/details.

[21] Loratadine is an antihistamine prescribed to relieve allergy symptoms. *Loratadine: MedlinePlus Drug Information*, MEDLINEPLUS, (Oct. 14, 2014, 3:29 PM), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697038.html.

[22] Buspirone is prescribed to treat anxiety. *buspirone oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:31 PM), http://www.webmd.com/drugs/2/drug-8876/buspirone-oral/details.

[23] Promethazine-DM works like an antihistamine and is prescribed to treat the common cold and allergies. *promethazine-DM oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:33 PM), http://www.webmd.com/drugs/2/drug-3402/promethazine-dm-oral/details.

disability management skills and recommended one-on-one counseling services and the support of family and friends.  Ms. Rufer diagnosed Plaintiff with Dysthymic Disorder and Generalized Anxiety Disorder with deferred rule out Borderline Intellectual Functioning.  Plaintiff was assessed a Global Assessment of Functioning (GAF) score of 55 (Docket No. 13, pp. 510-523 of 635).

      **b.**      **COUNSELING SERVICES**

On November 3, 2011, Plaintiff had an individual therapy session with Ms. Rufer, which lasted 55 minutes.  Plaintiff was described as depressed and tearful but cooperative.  Ms. Rufer obtained a psychiatry referral for Plaintiff  to The Center for future mental health services since Plaintiff does not have insurance (Docket No.13, p. 555 of 635).

      **3.**      **THE CENTER**

      **a.**      **PSYCHIATRIC EVALUATION**

- On December 15, 2011, Plaintiff underwent an initial psychiatric evaluation with Evelyn Williams, LPN and Ms. Emmons, a nurse practitioner assistant and reported being depressed because her mother has dementia, that she (Plaintiff) was having anxiety, has no insurance coverage, works three days a week and had been treating with Remeron prescribed by her primary care physician.  The treatment notes from the evaluation list diagnoses of major depressive disorder recurrent moderate, Generalized Anxiety Disorder, and she was assessed a GAF score of 38.  Plaintiff was prescribed Prozac and it was recommended that she continue therapy and follow-up in one month (Docket No. 13, pp. 560-565 of 635).

- On April 29, 2013, a second Psychiatric Evaluation form is included for Plaintiff which was also rendered by Ms. Williams and Ms. Emmons.  The form reflects that Plaintiff reported having a rough year after having a fire, suffering from a medical scare, and losing her mother in April.  Plaintiff indicated she was depressed and had occasional thoughts of overdosing on medications.  Plaintiff also reported experiencing panic attacks two to three times a week, and not enjoying much of anything and isolating herself.  The evaluation notes diagnoses including Major Depressive Disorder, recurrent, moderate, Panic Disorder without agoraphobia, and assesses a GAF score of 54 (Docket No. 13, pp. 630-635 of 635).

      **b.**      **ADULT DIAGNOSTIC ASSESSMENT**

On November 8, 2011, Plaintiff underwent an adult diagnostic assessment with a licensed social worker and reported having lots of depression and that her anxiety gets really bad when she shops in a store.  A summary

of Plaintiff's educational history reflects that the highest grade level of school she completed was ninth grade and that she was placed in special education classes. Plaintiff reported using tobacco daily and last having consumed alcohol a couple years earlier. Plaintiff's diagnosis is listed as Major Depressive Disorder recurring, moderate, Panic Disorder without Agoraphobia, and she was assessed a GAF score of 38. A mental status exam describes Plaintiff as disheveled in appearance, overweight, withdrawn, maintaining normal eye contact, activity, and speech. No delusions, hallucinations, self abuse or aggressive behavior were noted. Plaintiff's thought process was noted as having flight of ideas, her mood depressed and anxious with flat affect (Docket No. 13, pp. 566-578 of 635).

### c.    TREATMENT

- On January 12, 2012, Plaintiff met with Evelyn Williams for psychiatric care and complained that she was depressed, experiencing anxiety, and had been compliant with her medications. Ms. Williams described Plaintiff as having appropriate appearance, coherent thought process, showing no signs of delusions or paranoia, that Plaintiff denied experiencing hallucinations, was of anxious affect, but cooperative, alert, oriented x 3. Plaintiff's judgment was noted as being intact and that she denied any substance abuse or trauma. Plaintiff's diagnosis reflects Major Depressive Disorder (MDD) recurrent moderate, hepitis C, diabetes mellitus, COPD, arthritis, and hypertension. Plaintiff was prescribed Celexa and BuSpar[24] and referred for a medical assessment (Docket No. 13, pp. 558-559 of 635).

- On April 3, 2012, Plaintiff saw Ms. Emmons and reported recently having had a house fire and losing everything, that her mother was in a nursing home, and that she had been experiencing crying spells, and anxiety related to concentration difficulties. Plaintiff requested to change her medication back to Prozac, and questioned whether an increase in BuSpar would be helpful. The notes indicate that Plaintiff was undergoing therapy with Tricia Clark. Plaintiff's mental status was described as casual and appropriate, with logical and coherent thought process, denying delusions, paranoia, or hallucinations. Plaintiff's mood was noted as dysphoric with anxious affect. Plaintiff denied suicidal or homicidal ideations, her behavior was tense, she was alert and oriented, with intact insight and judgment, and Plaintiff was noted having denied substance abuse. Ms. Emmons' diagnosis for Plaintiff included MDD, recurrent, moderate. Plaintiff's treatment plan listed medication monitoring, and continued therapy with Tricia Clark (Docket No. 13, pp. 601-602 of 635).

---

[24] BuSpar is prescribed to treat anxiety. *BuSpar oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 14, 2014, 3:35 PM), http://www.webmd.com/drugs/2/drug-9036/buspar-oral/details.

14

### d.    MENTAL STATUS QUESTIONNAIRE

On January 30, 2012, Ms. Emmons completed a Mental Status Questionnaire concerning Plaintiff.  The questionnaire reflects that Plaintiff was first seen on December 15, 2011 and last seen on January 12, 2012, however, elsewhere on the form Ms. Emmons indicated that Plaintiff was only seen twice.  Ms. Emmons described Plaintiff's appearance as appropriate, her flow of conversation spontaneous, having improved mood, being less depressed and having anxious affect.  Ms. Emmons indicated that Plaintiff has no thinking disorders, is oriented x 3, has no problems with cognitive functions, and insight and judgment.  Plaintiff's diagnosis was noted as Major Depression, recurrent, moderate and her medications are listed.  According to Ms. Emmons, Plaintiff is capable of managing any benefits due to her, and has no difficulties in remembering, understanding, and following directions, maintaining attention, sustaining concentration, persisting at tasks, and completing them in a timely fashion.  Ms. Emmons indicated that it was unknown whether Plaintiff had any deficiencies in social interaction or in Plaintiff's reactions to the pressures in work settings involved in simple, routine or repetitive tasks (Docket No. 13, pp. 580-582 of 635).

### e.    ADULT DIAGNOSTIC ASSESSMENT UPDATE

The record also includes an Adult Diagnostic Update dated March 12, 2013, completed by Megan Buesridge, a licensed social worker, concerning Plaintiff's mental health treatment.  The record reflects that Plaintiff was continuing to experience anxiety and depression on a daily basis, had been victim of a house fire, was grieving the loss of her mother, and details her history of present illness.  Plaintiff's primary diagnosis was noted as MDD, recurrent and moderate secondary to Panic Disorder without Agoraphobia.  Plaintiff was assessed a GAF of 50.  It was noted that Plaintiff reported feeling some nervousness, extreme tension, a bit of terror/panic, extreme restlessness and that she was afraid to leave her home by herself.  The update forms reflect Plaintiff was referred for medication management and individual counseling (Docket No. 13, pp. 627-630 of 635).

## C.    CONSULTATIVE PSYCHOLOGICAL EXAMINATION

15

1.    DR. JAMES F. SUNBURY, PH.D, ABPP

On February 7, 2012, Plaintiff underwent a clinical interview and psychological tests with Dr. Sanbury to assess her intellectual functioning and mental status.  During the interview, Plaintiff detailed her history of present illness, family and educational history.  It was noted that Plaintiff left high school in the ninth grade, was enrolled in special education programs, and has not earned a GED.  Plaintiff reported being employed as a nurses' aide.  Dr. Sunbury noted that Plaintiff has not been previously hospitalized for psychiatric care, first treated for depression with medication in 2004, denied alcohol abuse, but admitted being addicted to crack fourteen years earlier.  Plaintiff was described as obese, having pain in her hips and legs, and reported her medications as Flexeril, Lisinopril, Neurontin, Spiriva, Januvia, and Simvastatin.  Plaintiff denied any arrest record.  Dr. Sanbury indicated Plaintiff was a little unsteady on her feet, but that she was otherwise neatly groomed and showed no signs of intoxication.  Plaintiff was described as responsive to questions with no obvious difficulty in speech or hearing.  Dr. Sanbury indicated that Plaintiff reported that she cries often including a little during the interview but that her mood and affect was not irritable or acutely upset.  Dr. Sanbury's notes reflects that Plaintiff also reported experiencing anxiety.  Dr. Sanbury found that Plaintiff showed no signs of thought disorder, was alert and oriented to place and person, but operating within the extremely low range of intellectual functioning. Dr. Sanbury opined that Plaintiff's insight and judgment seemed low-average.  Results of Plaintiff's Wechsler Adult Intelligence Scale-IV (WAIS-IV) test included a full scale IQ of 64, which Dr. Sanbury noted was in the extremely low range and only 1% higher than non-institutionalized adults in her age group.  Dr. Sanbury's diagnosis for Plaintiff included Depressive Disorder not otherwise specified and assessed her a GAF score of 60 for moderate symptoms and a GAF score of 65 for functional impairment. Dr. Sanbury's functional assessment reflects that Plaintiff has no limitations for carrying out simple instructions, and in responding appropriately to supervision or co-workers in a work setting.  Dr. Sanbury assessed Plaintiff mild limitations in her ability in maintaining attention, concentration, persistence, and pace

to perform simple and multi-step tasks, and in her ability to respond appropriately to pressures in a work setting (Docket No. 13, pp. 585-591 of 635).

**E.    AGENCY'S FINDINGS**

    **1.    INITIAL CONSIDERATION**

        **a.    DR. KARLA VOYTEN, PH.D. - PSYCHIATRIC REVIEW TECHNIQUE (PRT)**

On February 22, 2012, Dr. Voyten rendered a PRT for Plaintiff under listings 12.04 Affective Disorders, 12.05 Mental Retardation, and 12.06 Anxiety-Related Disorders finding. For the 'A' criteria of the three listings, Dr. Voyten concluded that there was insufficient evidence to substantiate the presence of a disorder under listing 12.05 and that Plaintiff had medically determinable impairments which did not precisely satisfy the diagnostic criteria under listings 12.04 and 12.06. In her analysis of the 'B' criteria of listings 12.04 and 12.06, Dr. Voyten found Plaintiff had mild restrictions in activities of daily living, and in maintaining concentration, persistence or pace. Dr. Voyten found no restrictions for Plaintiff's social functioning and found no evidence of decompensation. There was also no evidence establishing the presence of the 'C' criteria under either listing. Dr. Voyten indicated adopting, pursuant to the *Drummond* Ruling, the ALJ's PRTF rendered on October 4, 2010. Furthermore, Dr. Voyten concluded there was no evidence to support the low IQ testing rendered for Plaintiff and that the examiner had failed to give a related diagnosis for intellectual limitation. Dr. Voyten also noted the lack of evidence of an event to suggest recent onset of limitation in intellectual functioning (Docket No.13, pp. 184-186; 196-197 of 635).

        **b.    DR. WILLIAM BOLZ, M.D. - PHYSICAL RESIDUAL FUNCTIONAL CAPACITY (RFC)**

On December 19, 2011, Dr. Bolz rendered a physical RFC for Plaintiff finding that she could occasionally lift or carry 20 pounds, frequently lift or carry ten pounds, could stand, walk or sit, with normal breaks, for about six hours during an eight-hour workday. Plaintiff was assessed environmental limitations, including to avoid concentrated exposure to extreme cold, heat, humidity, fumes, odors, dusts, gases, and poor

ventilation.  It was noted that this RFC was adopted from the prior ALJ RFC rendered on October 4, 2010 and pursuant to the *Drummond* Rule (Docket No. 13, pp. 186-187; 198-199 of 635).

### 2.  RECONSIDERATION

#### a.  DR. VICKI WARREN, PH.D. - PRT

On May 7, 2012, Dr. Warren rendered her PRT for Plaintiff evaluating Plaintiff's claim under listing 12.04, 12.05, and 12.06.  Dr. Warren found that although  medically determinable impairments were present, none precisely satisfied the diagnostic 'A' criteria for any of the listings.  In her analysis of the 'B' criteria of the listings, Dr. Warren found Plaintiff had mild restrictions in activities of daily living and in maintaining concentration, persistence or pace, but found no limitations in social functioning or repeated episodes of decompensation.  Dr. Warren determined there was no evidence of any 'C' criteria and noted that her PRT is adopted under the *Drummond* Ruling.  Dr. Warren also indicated there was no evidence to support a low IQ finding (Docket No. 13, pp. 210-211; 223-225 of 635).

#### b.  DR. BRADLEY J. LEWIS, M.D. - PHYSICAL RFC

On May 8, 2012, Dr. Lewis rendered his physical RFC, finding Plaintiff capable of occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, standing, walking, or sitting, with normal breaks, for a total of about six hours during an eight-hour workday.  Dr. Lewis assessed Plaintiff's environmental limitations, opining that she avoid concentrated exposure to extreme cold, heat, humidity, fumes, odors, dusts, gases, and poor ventilation.  Dr. Lewis noted that the RFC was an adoption of the ALJ RFC dated October 4, 2010 and pursuant to the *Drummond* Ruling.  Dr. Lewis opined that Plaintiff had the RFC to perform light work, but needed to be allowed to change positions as needed (Docket No. 13, pp. 213-214; 226-227 of 635).

### III.  STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*,

2014 WL 916945, *2 (N.D. Ohio 2014).  At step one, a claimant must demonstrate that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F.2d at 923).  At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014).  If the claimant meets her burden she is declared disabled; however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations."  20 C.F.R. § 416.945(a) (West 2014).  In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014).  At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014).  Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b),  416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  While the claimant has

the burden of proof in steps one through four, the Commissioner has the burden of proof at step five to show

"that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203

F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the

claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*,

820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will

be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  If an adjustment cannot be made then

the claimant is disabled. *Id.*

## IV. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Dowling made the

following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016.

2.  Plaintiff has not engaged in substantial gainful activity since September 1, 2008, the alleged onset date.

3.  Plaintiff has the following severe impairments: degenerative disc disease, obesity, chronic obstructive pulmonary disease, and major depressive disorder.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, ALJ Dowling found that Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b) except she requires work that allows for alternating between sitting and standing at will, provided Plaintiff remains productive.  Finally, Plaintiff is limited to work that requires only simple, routine tasks.

6.  Plaintiff is unable to perform any past relevant work.

7.  Plaintiff was born on February 26, 1962 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Plaintiff subsequently changed age category to closely approaching advanced age.

8.  Plaintiff has a limited education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11. Plaintiff has not been under a disability as defined in the Social Security Act from September 1, 2008, through the date of this decision.

(Docket No. 13, pp. 70-80 of 635).

## V. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)). "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is more than a scintilla of evidence but less than a preponderance." *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone

of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence and argues: (1) that the ALJ's RFC analysis for Plaintiff fails to account for her IQ and moderate difficulties with concentration, persistence or pace; and (2) the ALJ erred in failing to apply the medical/vocational guidelines to her case because it would have led to the conclusion that she is disabled (Docket No. 17).

### B.    DEFENDANT'S ALLEGATIONS

Defendant maintains that the ALJ's mental RFC was properly assessed, consistent with Plaintiff's IQ score, and within the ALJ's zone of choice (Docket No. 20, pp. 7-9 of 13).  Defendant argues that the ALJ's consideration of the VE was reasonable since Plaintiff offered no medical evidence to support her testimony that she can only stand one and one-half hours per day (Docket No. 20, p. 9 of 13).

### C.    ANALYSIS

#### 1.    THE ALJ'S RFC ASSESSMENT ADEQUATELY ADDRESSES PLAINTIFF'S MENTAL LIMITATIONS

Plaintiff first alleges that the ALJ's RFC assessment is not supported by substantial evidence since the ALJ found Plaintiff had moderate difficulties with concentration, persistence or pace, but only assessed Plaintiff a limitation in her RFC for simple routine tasks (Docket No. 17, pp. 9-10 of 12).  Citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), Plaintiff argues that the ALJ's RFC does not adequately portray Plaintiff's limitations (Docket No. 17, p. 10 of 12).  Defendant disagrees and argues that *Ealy* does not provide a bright-line rule that limitations to simple and repetitive tasks cannot account for a moderate limitation in concentration, persistence or pace (Docket No. 20, pp. 7-8 of 13).  Defendant also contends that Plaintiff has also failed to demonstrate with evidence that she has any greater limitations than those assessed by the ALJ (Docket No. 20,

22

pp. 8-9 of 13). Plaintiff misconstrues the effect of the ALJ's findings at step-three of the sequential analysis on steps four and five.

At step-three of the five-step sequential analysis for evaluating a disability claim, the ALJ was required to determine whether the claimant has an impairment or combination of impairments that meets or medically equals one of the listed impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1. See 20 C.F.R. § 416.920(d) (West 2014). Part of the step-three analysis requires the ALJ to use a special technique set forth under the regulations for evaluating mental impairments, which includes rating the degree of functional limitation resulting from the claimant's impairment. 20 C.F.R. § 416.920a(a)-© (West 2014). The regulations identify four broad functional areas under which the ALJ must render a rating: Activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3) (West 2014). The rating scale, which is also defined by regulations, includes the following five-point scale: None, mild, moderate, marked, and extreme, which is used to rate all but episodes of decompensation. 20 C.F.R. 416.920a(c)(4) (West 2014). In evaluating the severity of Plaintiff's impairment(s) under the "paragraph B" criteria of listing 12.04, the ALJ found, in relevant part, that Plaintiff had moderate difficulties in concentration, persistence or pace in accordance with the regulations (Docket No. 13, p. 74 of 635). *See* 20 C.F.R. § 416.920a(e)(4) (West 2014). Citing this finding, Plaintiff argues that the ALJ's RFC failed to account for Plaintiff's "moderate difficulties with regards to concentration, persistence or pace" (Docket No. 17, pp. 9-10 of 12). In so arguing, Plaintiff overlooks the disclaimer at the end of his step-three analysis and SSR 96-8p, which provides:

> The psychiatric review technique described in 20 C.F.R. 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. *The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.* The mental RFC used at steps 4 and 5 of

23

> the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p, 1996 WL 374184, *4 (July 2, 1996)(emphasis added). Given the ALJ's findings at step-three are not part of the RFC assessment, the ALJ did not find Plaintiff's RFC included moderate limitations for concentration, persistence or pace. Instead, the ALJ limited Plaintiff to light work that allows for alternating between sitting and standing at will and a limitation to work that requires only simple, routine tasks, which the ALJ determined was necessary because Plaintiff's mental impairments have worsened (Docket No. 13, pp. 75; 78 of 635).

Although Plaintiff cites to Dr. Sunbury's findings concerning Plaintiff's IQ and low WAIS-IV scores to suggest that Plaintiff has moderate limitations in concentration, persistence or pace, Dr. Sunbury's functional assessment does not support such a finding. Instead, Dr. Sunbury opined that Plaintiff has no limitations for simple instructions and only mild limitations for learning new multi-step tasks and responding appropriately to pressures in a work setting (Docket No. 13, p. 589 of 635). Moreover, none of the opinion evidence the ALJ weighed most favorably supports more than a limitation for simple and repetitive tasks (Docket No. 13, pp. 167-168; 186-187; 198-199; 580-582 of 635). While Plaintiff cites *Ealy* and suggests that this case be remanded because the ALJ did not adequately address Plaintiff's mental limitations in his hypothetical question to the VE, *Ealy* is inapplicable to this case (Docket No. 17, p. 10 of 12). The relevant facts of *Ealy* involved whether the ALJ's hypothetical question accurately reflected the claimant's limitations at step-five of the sequential analysis. *Ealy*, 594 F.3d at 511, 516-17. After reviewing the transcript, the Sixth Circuit reversed and remanded *Ealy*, holding in relevant part, that the ALJ erred by posing a hypothetical question to the ALJ, which omitted speed and pace-based restrictions that the ALJ determined the claimant had. *Id.* at 516-17.

Once an ALJ determines at step-four that a claimant does not have the residual functional capacity to perform his or her past relevant work, the burden shifts to the Commissioner to show that the claimant has the

24

capacity to perform other substantial gainful activity in the national economy. *Varley*, 820 F.2d at 779 (citation omitted). In order for the Commissioner to meet its burden, it must find substantial evidence that the claimant has the vocational qualifications to perform specific jobs in the national economy. *See O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays Plaintiff's individual and mental impairments." *Varley*, 820 F.2d at 779 (*quoting Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). In this case, unlike *Ealy*, the ALJ's hypothetical question to the VE included a limitation for simple and routine tasks, which is consistent with the ALJ's RFC assessment, analysis, and the opinion evidence he weighed most favorably (Docket No. 13, p. 114 of 635).

Accordingly, the undersigned Magistrate finds the ALJ's RFC and hypothetical questions adequately addressed Plaintiff's mental limitations.

### 2. THE ALJ'S RELIANCE ON THE VE'S TESTIMONY TO FIND PLAINTIFF CAPABLE OF PERFORMING OTHER WORK IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Next, Plaintiff alleges that the ALJ erred in his analysis of whether she could perform other work, arguing the ALJ should have credited the VE's testimony that a limitation for standing for one and one-half hours during a normal eight-hour workday is more closely aligned with sedentary work, which given Plaintiff's age, limited education and non-transferrable skills, should have led to a finding that she is disabled pursuant to the vocational guidelines (Docket No. 17, pp. 10-11 of 12). Plaintiff supports her argument by citing her own testimony that she could only stand for one and a half hours during a normal eight-hour work day because of hip and leg pain (Docket No. 17, p. 11 of 12). Defendant contends that there is no evidence to support Plaintiff's claim that she is only capable of standing for one and a half hours (Docket No. 20, p. 10 of 13).

"The SSA's burden at the fifth step is to prove the availability of jobs in the national economy that the claimant is capable of performing." *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)(citing *Her*,

203 F.3d at 391). The Sixth Circuit has held that "the SSA may not rely on the grids to meet its step-five burden where the evidence shows that a claimant has nonexertional impairments that preclude the performance of a full range of work at a given level." *Id.* at 424 (citing *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990); *Damron v. Sec'y of Health & Human Servs.*, 778 F.2d 279, 282 (6th Cir. 1985)).  Reliance on the grids alone is only appropriate where a claimant suffers from an impairment limiting his or her exertional capabilities. *Jordan*, 548 F.3d at 424.[25]

In this case, the ALJ's decision reflects that he considered the Medical-Vocational Guidelines with respect to Plaintiff's limitations, and relied on the testimony of the VE to determine the extent to which Plaintiff's limitations have eroded the unskilled light occupational base in order to evaluate whether jobs exist in the national economy which an individual with Plaintiff's age, education, work experience and RFC would be able to perform (Docket No. 13, pp. 79-80 of 635).  The VE provided testimony that given Plaintiff's RFC, and vocational background, a hypothetical individual would be able to perform the representative occupations of office helper, ticket seller, and cashier, which the ALJ determined was consistent with the information contained in the DOT (Docket No. 13, pp. 79-80 of 635).  It is well-settled, that substantial evidence at the fifth step may be produced through the ALJ's reliance on the testimony of a VE in response to a hypothetical question that accurately portrays a plaintiff's impairments. *See Varley*, 820 F.2d at 779.

Plaintiff's argument that she should have been evaluated under a RFC for sedentary work relies upon

---

[25]  The SSA defines exertional and nonexertional limitations as follows:

Exertional limitations.  When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying pushing, and pulling), we consider that you have only exertional limitations.

Nonexertional limitations.  When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet demands of jobs other than the strength demands, we consider that you have only nonexertional limitations or restrictions.

*Jordan*, 548 F.3d at 423 (citing 20 C.F.R. §§ 404.1569a(b), (c).(West 2014)).

unsubstantiated testimony that she can only be on her feet for one and a half hours (Docket No. 17, p. 11 of 12). The Sixth Circuit has held that an "ALJ is not obligated to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994)(citing *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987)). In this case, the ALJ found that Plaintiff presented sincerely, but he did not find that her claims concerning the severity of her symptoms or the extent of her incapacitation were supported by the evidence of record (Docket No. 13, pp. 77-78 of 635). The ALJ reasoned that there was no evidence to support Plaintiff's claim that her condition had worsened much since the administrative hearing held in her prior disability case on October 4, 2010 (Docket No. 13, p. 161 of 635). After reviewing the record in this case, the undersigned finds the ALJ's summary of Plaintiff's physical condition is consistent with the summary provided in the ALJ's decision (Docket No. 13, p. 76 of 635). Plaintiff's medical records reflect that on April 14, 2009, an MRI revealed that Plaintiff had multiple levels of degenerative disc change with joint anthropathy and mild spinal stenosis at L4-5 (Docket No. 13, pp. 76; 461-462 of 635). On July 14, 2009, Dr. Toward opined that Plaintiff has lumbago, lumbar disc degeneration, and chronic pain syndrome (Docket No. 13, pp. 505-507 of 635). Throughout the remainder of Plaintiff's medical record, it is noted that she complained about pain, but there is no indication that Plaintiff suffered difficulties from standing or walking. There is also no objective medical evidence or findings to suggest that her physical condition has declined or progressed to the extent she alleges. Similarly, no medical source has rendered an opinion, findings, or provided objective evidence to support Plaintiff's claim that she can only stand for one and a half hours during an eight-hour workday.

Since the medical record does not support Plaintiff's claim concerning her ability to stand, the ALJ did not err by failing to credit it. Therefore, the undersigned Magistrate finds the ALJ's reliance on the VE's testimony that Plaintiff is capable of performing other work is supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   January 7, 2015